******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* RODNEY WATERS
## (AC 44342)

Prescott, Alexander and Clark, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of operating a motor vehicle while under the influence of intoxicating liquor, and, under a part B information, on a plea of guilty, of being a second time offender pursuant to statute (§ 14-227a (g) (2)), the defendant appealed to this court. The defendant had attempted to make a U-turn when the car he was driving twice struck a car being driven by A. The defendant drove away from the accident scene and went home, where he claimed to have consumed a significant amount of alcohol and smoked a "spliff." When the defendant reappeared at the scene on foot about twenty minutes later, A identified him as the driver of the other car. Police officers noticed that he was acting aggressively, slurring his speech and moving unsteadily. The defendant thereafter failed three sobriety tests the police administered to him and was taken to the police station where he was questioned after being advised of his rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436). The defendant was charged under subdivision (1) of § 14-227a (a), the behavioral subdivision, pursuant to which blood alcohol levels generally are excluded from evidence without a defendant's consent, in accordance with § 14-227a (c). The defendant testified on his own behalf, including testifying that he had not begun to consume alcohol until after he returned home after the incident with A. The state offered as rebuttal evidence the testimony of its expert witness, L, a forensic toxicologist. L testified in response to a set of hypothetical facts about the amount of time it typically takes for alcohol to have observable effects on an individual's motor functions and typical behavior associated with certain blood alcohol levels. The court overruled the defendant's objection to L's testimony. On appeal, the defendant claimed, inter alia, that L's testimony was tantamount to testimony about the defendant's blood alcohol content and, thus, violated the prohibition of such testimony under § 14-227a (c) in a prosecution under the behavioral subdivision. *Held*:

1. The evidence was sufficient to support the defendant's conviction of operating a motor vehicle while under the influence of intoxicating liquor: the defendant's reckless driving, the fact that he drove away from the accident scene, and his slurred speech and belligerent behavior toward the police when he returned to the scene permitted the jury reasonably to infer that he was intoxicated when his car struck A's car; moreover, the defendant admitted that he had been driving, he was substantially unable to follow the police officers' instructions when he failed the sobriety tests, and his refusal to take a breath analysis or urine test at the police station permitted an inference that a test would have revealed that he had an elevated blood alcohol content; furthermore, the jury reasonably could have inferred that the defendant's intoxication when he reappeared at the accident scene was not reasonably attributable to his drinking when he arrived home after leaving the scene, which was supported by L's testimony, and, although the defendant claimed that A's testimony was suspect and that the jury was obligated to credit his testimony that he consumed a significant amount of alcohol when he returned home, it was within the jury's province to determine whose testimony to credit.

2. The defendant could not prevail under *State* v. *Golding* (213 Conn. 233) or the plain error doctrine on his unpreserved claim that the trial court improperly permitted L to testify, in violation of § 14-227a (c), about the likely blood alcohol content of a person who was slurring his speech:
   a. Because the defendant objected to L's testimony on the ground that it was irrelevant and that L could not provide any definite conclusions about the defendant's blood alcohol content, the defendant's claim on appeal was unpreserved, as he did not cite to § 14-227a (c) or otherwise inform the trial court that the admission of L's testimony without the defendant's consent would violate § 14-227a (c).

b. The defendant's claim that he was denied his right to due process as a result of L's testimony was unavailing; the defendant failed to demonstrate that the testimony was so crucial, critical and highly significant that he was denied a fair trial, as his claim did not implicate anything more than an evidentiary or statutory claim and, thus, could not be reviewed because it was not constitutional in nature, as required by *Golding.*

c. Although the state violated the spirit if not the letter of § 14-227a (c) by seeking to admit opinion testimony in a behavioral case under § 14-227a (a) (1) that implicitly related to the defendant's blood alcohol content, the defendant nevertheless failed to demonstrate the existence of plain error.

3. The trial court did not abuse its discretion in determining that the defendant failed to establish a proper foundation to cross-examine L about whether other substances could have affected the rate at which an individual can become visibly intoxicated from alcohol: although the defendant had the opportunity to lay a factual foundation as to what substances he ingested, he did not define what a spliff was or what substances it contained, and, without that evidentiary foundation, any opinion by L regarding the effect of other substances in combination with alcohol on the rate of intoxication lacked relevance; accordingly, the court's decision to preclude L's testimony on that basis did not violate the defendant's sixth amendment right to confrontation.

4. The record was inadequate to review the defendant's claim that the trial court improperly denied his motion to suppress statements he made at the accident scene and at the police station, as he failed to seek a proper memorandum of decision from the court addressing all of the arguments he raised in his motion or to seek an articulation of the court's decision, which was made without having conducted an evidentiary hearing prior to ruling on the motion.

Argued April 11—officially released August 2, 2022

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crime of operating a motor vehicle while under the influence of intoxicating liquor, and, in the second part, with having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs, brought to the Superior Court in the judicial district of New Haven, where the court, *B. Fischer, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the first part of the information was tried to the jury before *B. Fischer, J.*; verdict of guilty; subsequently, the defendant was presented to the court on a plea of guilty to the second part of the information; judgment of guilty in accordance with the verdict and the plea, from which the defendant appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender, with whom was *Juan Carlos Leal*, certified legal intern, for the appellant (defendant).

*Nathan J. Buchok*, deputy assistant state's attorney, with whom were *Kathleen E. Morgan*, deputy assistant state's attorney, and, on the brief, *Patrick J. Griffin*, former state's attorney, *Timothy F. Costello*, senior assistant state's attorney, and *Kevin M. Black, Jr.*, former special deputy assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Rodney Waters, appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of alcohol in violation of General Statutes § 14-227a (a) (1), and, following a plea of guilty to a part B information, of being a second time offender pursuant to § 14-227a (g) (2). On appeal, the defendant claims that his conviction under § 14-227a (a) (1) is not supported by sufficient evidence. He also claims that the trial court improperly admitted expert testimony related to the defendant's blood alcohol content (BAC) in contravention of § 14-227a (c), restricted his cross-examination of the state's expert witness, and denied his motion to suppress inculpatory statements he made to the police. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. At approximately 8:45 p.m. on May 18, 2019, Tion Adlam was driving on Dixwell Avenue in New Haven with her mother, daughter, and stepfather when she observed the car ahead of her being driven recklessly and attempting a U-turn. Adlam stopped her car, but the other driver, later identified as the defendant, drove his car into the left side of her car, causing it to "jerk . . . ." After the initial impact, the defendant's car struck her car at least once more. Adlam was forced to reverse her car to get out of the way. Before the defendant fled from the scene, Adlam saw him and took a photograph of his car's license plate.

Adlam called 911 to report the incident. Officers Christopher Troche, Marco Correa, and Robert Stratton of the New Haven Police Department arrived on the scene at approximately 9 p.m. and spoke with Adlam. At approximately 9:05 p.m., twenty minutes after the accident occurred, the defendant appeared at the scene on foot, and Adlam identified him as the driver of the other car involved in the accident.

The officers then approached the defendant. Upon speaking with him, they observed him acting aggressively, slurring his speech, and moving unsteadily. After this initial interaction with the police, the defendant walked away from the scene but returned about ten minutes later. Upon his return, the police placed the defendant in handcuffs while Stratton confirmed that the defendant's address matched the registered address of the suspect's vehicle.[1] After receiving confirmation, Stratton and Troche had the defendant perform three field sobriety tests:[2] (1) the horizontal gaze nystagmus test,[3] (2) the walk and turn test,[4] and (3) the one leg stand test.[5] The defendant failed all three field sobriety tests.

As a result of failing the field sobriety tests and being identified as the driver of the other car involved in the

accident, the defendant was transported to the police station and brought to the "intoxilyzer room."[6] Shortly after arriving at the station, Correa read the defendant his *Miranda* rights.[7] The defendant declined a breath analysis test, despite Stratton's warning that it would be deemed a refusal. Although the defendant initially agreed to submit to a urine test, he proceeded to get angry, raise his voice, and tell the officers to "unshackle" him because he was a "linebacker." Stratton asked him if he would be "alright" if he removed the defendant's handcuffs. The defendant replied, "yes," but remained aggressive, once again stating that he was a linebacker. Stratton deemed this behavior as a refusal to do the urine test.

Correa then proceeded to ask the defendant questions from an A-44 form,[8] including whether he was injured, suffered from any medical conditions, and if he had taken any drugs. The defendant answered most of the questions, despite a reminder from Correa that he could refuse to answer. The defendant subsequently was charged with operating a motor vehicle while under the influence in violation of § 14-227a (1). The state also charged the defendant, by way of a part B information, with operating a motor vehicle while under the influence of intoxicating liquor or drugs as a second offender pursuant to § 14-227a (g) (2).

On February 6, 2020, a jury trial commenced. The state called three witnesses to testify: Adlam, Stratton, and Troche. After the state rested its case, the defendant testified on his own behalf. According to the defendant, he had not begun to consume alcohol on May 18, 2019, until after he returned home following the incident with Adlam. Specifically, the defendant testified that he returned home immediately after the accident and quickly consumed a "Jamaican splash," a mixed drink that consisted of about ten to twelve ounces of high-proof rum, wine, and cranberry juice. After finishing the mixed drink, he testified that he smoked a "spliff" and sipped from a half pint bottle of vodka.

In response to the defendant's testimony, the state offered, and the court admitted, rebuttal evidence from Robert Lockwood, a forensic toxicologist employed at the state's forensics laboratory. Lockwood testified about the amount of time after the consumption of alcohol that it typically takes for the alcohol to have observable effects on an individual's motor functions and typical behaviors associated with certain BAC levels.

The jury found the defendant guilty of operating a motor vehicle while under the influence of alcohol in violation of § 14-227a (a) (1). The defendant then pleaded guilty to being a second time offender under § 14-227a (g) (2). The court, *B. Fischer, J.*, later sentenced the defendant to two years of incarceration, execution suspended after nine months, 120 days of

which was the mandatory minimum sentence, followed by two years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to support his conviction of operating a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227a (a) (1). With respect to this claim, the defendant makes three related arguments. First, the defendant asserts that the only evidence of his intoxication while driving was Adlam's testimony and that her testimony was insufficient and lacked credibility. Second, the defendant argues that the officers' observations and the defendant's performance on field sobriety tests were not sufficient to establish that the defendant was intoxicated while driving because they did not take place until one-half hour after the defendant had stopped driving. Third, the defendant argues that Lockwood's testimony did not establish that the defendant was intoxicated due to drinking that occurred before, rather than after, the defendant stopped driving. We are not persuaded that the evidence in the present case was insufficient to prove beyond a reasonable doubt that the defendant operated a motor vehicle while under the influence of intoxicating liquor.

We begin our analysis by setting forth the well established legal principles for assessing an insufficiency of the evidence claim. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Petersen*, 196 Conn. App. 646, 655, 230 A.3d 696, cert. denied, 335 Conn. 921, 232 A.3d 1104 (2020).

"In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that no reasonable jury could arrive at the conclusion the jury did. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 233, 249 A.3d 683 (2020).

"If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other

proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Petersen*, supra, 196 Conn. App. 655.

"[E]stablished case law commands us to review claims of evidentiary insufficiency in light of all of the evidence [adduced at trial]." (Emphasis omitted; internal quotation marks omitted.) Id., 656. "Moreover, even improperly admitted evidence may be considered . . . since [c]laims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Internal quotation marks omitted.) *State* v. *Morelli*, 293 Conn. 147, 153, 976 A.2d 678 (2009).

Turning to our evaluation of the sufficiency of the evidence, we begin with the elements of the offense for which the defendant was convicted. Section 14-227a (a) provides in relevant part: "A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor (1) if such person operates a motor vehicle . . . while under the influence of intoxicating liquor . . . ."

The defendant's insufficiency of the evidence claim focuses only on the state's obligation to demonstrate beyond a reasonable doubt that the defendant was under the influence of intoxicating liquor *at the time he was operating his motor vehicle*. We conclude that the evidence admitted at trial, including the reasonable inferences that the jury was permitted to draw from that evidence, was sufficient to establish that the defendant operated a motor vehicle while under the influence of intoxicating liquor.

In construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the defendant drove recklessly and struck Adlam's car with his vehicle not only once but a second time as well. From his reckless operation of his motor vehicle, the jury was permitted, in conjunction with the evidence that he was visibly intoxicated twenty minutes later, to infer that he was already under the influence of intoxicating liquor when he struck Adlam's vehicle.

The defendant then immediately fled the scene after the accident. See, e.g., *State* v. *Holley*, 90 Conn. App. 350, 361, 877 A.2d 872 ("[f]light, when unexplained, tends to prove a consciousness of guilt" (internal quotation marks omitted)), cert. denied, 275 Conn. 929, 883 A.2d 1249 (2005). The jury was, of course, free to infer that the defendant fled the scene so that the police would not arrive to find him intoxicated.

Additionally, the defendant returned to the scene less than twenty minutes after the accident and was visibly intoxicated. He slurred his speech, behaved belligerently, and engaged in drunken behaviors such as stum-

bling and challenging officers to a push-up contest.

The defendant also failed three field sobriety tests administered within one-half hour after the defendant admittedly had been driving and during which he demonstrated a substantial inability to follow the officers' instructions. From these facts alone, the jury reasonably could have inferred that the defendant was under the influence of alcohol while driving and that his erratic operation of his vehicle and behavior at the scene was the result of his intoxication.

The defendant further refused to take a breath analysis or urine test. Pursuant to § 14-227a (e), the defendant's refusal of a breath or urine test is admissible evidence from which an adverse inference may be drawn that the test would have revealed an elevated BAC.

Even without the state's expert testimony, the jury reasonably could have inferred, based on the short period of time between the accident and when the defendant reappeared at the scene intoxicated, that his intoxication was not reasonably attributable to drinking that occurred within the short period of time after he ceased driving and when he arrived on foot at the scene of the accident. See, e.g., *State* v. *McShea*, 11 Conn. App. 338, 340–41, 527 A.2d 1 (1987) (jury reasonably could have inferred defendant was intoxicated while driving from "the time and location of the accident . . . the defendant's admission that he was driving the car; the evidence regarding the time sequence and its relationship to the defendant's degree of intoxication"); see also *State* v. *Morelli*, supra, 293 Conn. 160 (despite defendant's alternative explanation for his behavior, his failure of field sobriety tests, belligerent attitude, questionable driving practices, and refusal of Breathalyzer test were sufficient to prove beyond reasonable doubt that defendant had operated motor vehicle while under influence of intoxicating liquor). With Lockwood's testimony, the jury had additional evidence to support the conclusion that, even if the defendant had quickly consumed eight or nine drinks when he arrived home, he could not have reached the level of intoxication he exhibited only thirteen to fifteen minutes later.

In large measure, the defendant's insufficiency of the evidence claim is premised on his assertion that the jury was obligated to credit his testimony that he had consumed a significant amount of alcohol after arriving home and before returning to the scene of the incident, and that this explained his subsequent behavior, including the results of the field sobriety tests. It is the province of the jury, however, to weigh conflicting evidence and determine whose testimony to credit. Thus, the jury was under no obligation to credit any of the defendant's testimony. See, e.g., *State* v. *Allen*, 289 Conn. 550, 559, 958 A.2d 1214 (2008). Similarly, the defendant argues that "Adlam's testimony is suspect" because she was

angry with the defendant for hitting her car and endangering her family. As with the defendant's testimony, it was within the province of the jury to credit Adlam's testimony and to accept or reject any claim of bias she may have had against the defendant.

In support of his assertion that the state failed to prove that he was under the influence of intoxicating liquor while operating his motor vehicle, the defendant relies largely on *State* v. *DeCoster*, 147 Conn. 502, 162 A.2d 704 (1960). *DeCoster*, however, is readily distinguishable from the present case.

In *DeCoster*, a police officer found the defendant's car stopped on a street in New Haven with the key in the ignition but the engine turned off. Id., 504. The defendant was slumped at the steering wheel of the car. Id. There was visible damage to the defendant's car, and four nearby road signs were knocked over. Id. On the basis of these facts, the defendant was arrested and later found guilty of operating a motor vehicle while under the influence of intoxicating liquor. Id., 503–504. On appeal, however, our Supreme Court reversed the judgment of conviction on insufficiency grounds, concluding that the state had failed to prove that the defendant was under the influence of liquor at the time he was driving. See id., 505. The court found that "[n]o one had seen him operating the car, and there was no evidence to show how long it had been standing in the place where it was found. Even though [a fact finder] might infer that the defendant's car had struck the signs at the traffic circle, there was no evidence whatever to show when or how the collision occurred. Id., 504–505. The court concluded that, "[i]n the absence of any evidence as to the time when the defendant last operated his car, the conclusion of the trial court that he violated the statute was unwarranted and invaded the realm of speculation and conjecture." Id., 505.

In the present case, and unlike *DeCoster*, Adlam testified about how and when the collision between her and the defendant occurred. As established through Adlam, Troche, and Stratton's testimony, the defendant was admittedly driving at 8:47 p.m. and visibly intoxicated less than twenty minutes later at 9:05 p.m. The defendant failed field sobriety tests approximately thirty minutes after the accident. Furthermore, Lockwood testified that it would be unlikely for an individual to engage in the behavior the defendant exhibited within only thirteen to fifteen minutes after beginning to consume alcohol, even if that individual had quickly drank eight to nine drinks.

In sum, we are not persuaded that the evidence in the present case was insufficient to prove that the defendant operated a motor vehicle while under the influence of intoxicating liquor. We therefore conclude that the jury reasonably could have found the defendant guilty beyond a reasonable doubt of violating § 14-227a (a) (1).

## II

The defendant next claims that the trial court improperly admitted expert testimony regarding the likely BAC of an individual who is slurring his or her speech. The defendant asserts that this testimony was tantamount to testimony on the defendant's BAC and, thus, violated § 14-227a (c), which prohibits the admission of such testimony without the defendant's consent in a case in which the defendant is charged with violating § 14-227a (a) (1).[9] The defendant, in seeking to prevail on this claim, argues that the claim is preserved. The defendant argues in the alternative that, if the claim is not preserved, he is entitled to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), or pursuant to the plain error doctrine. We disagree with the defendant that his claim was preserved at trial. We also conclude that his claim is not entitled to review under *Golding* because it fails to satisfy *Golding*'s second prong. Finally, we are unpersuaded that he is entitled to prevail under the plain error doctrine.

Before turning to the relevant facts and procedural history, it is necessary to set forth the following legal principles. Section 14-227a (a) establishes two different ways an individual can commit the offense of operating a motor vehicle while under the influence of intoxicating liquor: "[a] person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both, or (2) while such person has an elevated blood alcohol content." "We previously have described . . . § 14-227a (a) (1) as the 'behavioral' subdivision and § [14-227a] (a) (2) as the 'per se' subdivision." *State* v. *Longo*, 106 Conn. App. 701, 705 n.5, 943 A.2d 488 (2008).

Section 14-227a (c) provides: "In any prosecution for a violation of subdivision (1) of subsection (a) of this section, reliable evidence respecting the amount of alcohol in the defendant's blood or urine at the time of the alleged offense, as shown by a chemical analysis of the defendant's blood, breath or urine, otherwise admissible under subsection (b) of this section, shall be admissible only at the request of the defendant." Thus, under § 14-227a (c), when an individual is prosecuted under the behavioral subdivision of the statute, the defendant's BAC is admissible "only at the request of the defendant."

The following additional facts and procedural history, which are undisputed in the record, are relevant to our resolution of the defendant's claim. After the defense rested, the state called Lockwood, a forensic toxicologist, as a rebuttal witness to testify as to the time it takes for an individual to exhibit effects on their motor

functions after drinking alcohol and the typical BAC of an individual exhibiting slurred speech. Prior to the state's offer of proof, defense counsel made a general objection to this testimony. Specifically, defense counsel stated: "I do have a general objection to the testimony, and my argument is that it's not relevant on this rebuttal. This—this expert can't testify to any definite conclusions . . . ."[10]

In response, the court stated, "[a]ll right. There has been evidence from the defendant that he did—that he just testified . . . that he consumed large amounts of alcoholic beverages in a very short period of time. I will allow the doctor to come up here . . . ."

The court then permitted the state to make an offer of proof outside the presence of the jury. During the state's offer of proof, Lockwood was presented a hypothetical and asked: "Given those facts, do you have an opinion regarding—at the rate of consumption, the rate of absorption of alcohol into the body given the facts I've asked you to assume, and the effects one could expect from the—on the human body of that much alcohol in that time period?" Lockwood then testified that the average time for an individual to begin to exhibit the effects of alcohol is between thirty and forty minutes after consumption. The expert was also asked, "when one is stumbling and slurring their words, do you have an opinion as to what BAC would be associated with that?" The expert replied, "[b]ased on my training and experience, when you have an individual with slurred speech, you are around a BAC of 0.16 or 0.17."

Following the state's offer of proof, the defendant maintained his original objection to the general relevancy of the evidence and "lack of definite conclusions." He did not otherwise explain the grounds for his objection. Specifically, the court asked the defendant whether he maintained his objection based on what he heard. The defendant responded, "yes." The court then stated, "[y]ou still do? Okay. I'm going to overrule the objection."

Lockwood then proceeded to testify in front of the jury as to his opinion on the amount of time it would take an individual who quickly drank eight or nine drinks to reach a level of intoxication that would visibly effect their motor functions.[11] Lockwood also opined on the typical BAC of an individual with slurred speech. Finally, Lockwood testified that it is not reasonably probable that an individual would be displaying signs of intoxication within thirteen to fifteen minutes from beginning to consume alcohol even if that individual had quickly drank eight or nine drinks.

### A

We begin by reviewing whether the defendant's claim that the admission of Lockwood's testimony violated § 14-227a (c) was preserved. It plainly was not.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . . We have explained that these requirements are not simply formalities. [A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Miranda*, 327 Conn. 451, 464–65, 174 A.3d 770 (2018).

The defendant simply objected on the grounds of relevancy and on the ability of the witness to testify about "definite conclusions." He did not alert the court or opposing party to the basis of the objection now raised on appeal. The defendant did not cite to § 14-227a (c) or otherwise inform the trial court of his claim that admitting the proffered evidence without his consent would violate a statutory provision. See *State* v. *Forrest*, 216 Conn. 139, 146, 578 A.2d 1066 (1990) ("the defendant, by objecting to the state's questions on relevancy grounds, failed to preserve properly [the statutory violation claim] he has raised on appeal").[12]

In sum, the defendant never articulated to the trial court the claim he now raises on appeal. Accordingly, we agree with the state that the claim is unpreserved.

B

We next turn to the defendant's argument that, even if his claim is not preserved, he is entitled to prevail pursuant to *Golding*. The defendant, likely recognizing that *Golding* review is limited to claims of a constitutional magnitude, argues that the admission of the evidence violated the defendant's due process rights because it violated the statutory prohibition contained in § 14-227a (c). We are not persuaded that a trial court's admission of evidence implicates anything more than an evidentiary or statutory claim. Thus, the claim fails under the second prong of *Golding* because it is not constitutional in nature.

Pursuant to *Golding*, as modified by *In re Yasiel R.*, supra, 317 Conn. 781, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record

is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Police*, 343 Conn. 274, 288, 273 A.3d 211 (2022).

"The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail [on the merits]. . . . Thus, *Golding* review of an unpreserved constitutional claim is available provided that the defendant can present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right." (Citation omitted; internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 307, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

"[T]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right. . . . Thus, [o]nce identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily [rejected]. . . . We previously have stated that the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." (Internal quotation marks omitted.) *State* v. *Gilbert I.*, 106 Conn. App. 793, 796, 944 A.2d 353, cert. denied, 287 Conn. 913, 950 A.2d 1289 (2008).

Though the defendant asserts that the admission of evidence violated his due process rights, he fails to brief or otherwise demonstrate that this alleged error was so crucial, critical, and highly significant that he was denied a fair trial.[13] See, e.g., *State* v. *Turner*, 334 Conn. 660, 674, 224 A.3d 129 (2020) (evidentiary error must be crucial, critical, and highly significant to degree that defendant was denied a fair trial in order to rise to constitutional error). The defendant has failed to cite to a single case from Connecticut, or elsewhere, that holds that the admission of BAC testing in a behavioral case violates the defendant's right to due process. Moreover, the defendant has not argued that, if the legislature had chosen not to include in § 14-227a (c) the prohibition on admissibility of the defendant's BAC, then the due process clause itself would have barred the admission of a defendant's BAC level in a behavioral case.

Because we conclude that the defendant's claim is

not constitutional in nature, it fails under the second prong of *Golding*. Accordingly, we decline to review it.

C

Finally, we address whether the defendant is entitled to prevail on his statutory claim under the plain error doctrine. See Practice Book § 60-5. We do not agree that Lockwood's testimony regarding the expected BAC of an individual exhibiting slurred speech, which the defendant exhibited, was plain error under the circumstances of this case.

We begin by setting forth the relevant legal principles. "[I]f a claim is unpreserved . . . an appellate court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . Application of the plain error doctrine is nevertheless reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Brett B.*, 186 Conn. App. 563, 603, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019).

There is a two step framework for evaluating claims under the plain error doctrine. "First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." (Internal quotation marks omitted.) *State* v. *Darryl W.*, 303 Conn. 353, 373, 33 A.3d 239 (2012).

In the present case, the trial court did not admit direct evidence of the defendant's BAC. Lockwood testified only about the BAC of a hypothetical individual who exhibited the same behaviors that the defendant had exhibited. On cross-examination, defense counsel made clear through his questioning of Lockwood that he was not testifying about the defendant's BAC and that the state's scenarios were purely hypothetical.[14] Although Lockwood's testimony may have implicitly suggested what the defendant's BAC level may have been, if it had been tested, we cannot say that the alleged error constituted "impropriety . . . so clear, obvious and indisputable as to warrant the extraordinary remedy of

reversal." (Internal quotation marks omitted.) Id.

In reaching this conclusion, we do not mean to suggest that the defendant could not have prevailed on this claim if it had been preserved properly and brought to the attention of the trial court. Although we do not conclude that the admission of this evidence is such a clear and obvious error that it results in a manifest injustice to the defendant, we are nevertheless troubled by the state's introduction of Lockwood's testimony regarding blood alcohol content. In *State* v. *Lopez*, 177 Conn. App. 651, 669–70, 173 A.3d 485, cert. denied, 327 Conn. 989, 175 A.3d 563 (2017), we made it clear that evidence pertaining to the expected BAC of a hypothetical individual exhibiting the same behavior as the defendant is problematic at best.

In *State* v. *Lopez*, supra, 177 Conn. App. 669, the state elicited testimony of the blood alcohol level of a hypothetical individual based on behaviors that the defendant had exhibited, such as his performance on the field sobriety tests. We stated: "Although we recognize that the language of the statute refers to blood alcohol content as shown by a chemical analysis of the defendant's blood, breath or urine . . . and that the blood alcohol content evidence in this case was not derived from such a chemical analysis, we do not believe that, at the time the legislature passed the statute, it contemplated that there would be any other way to demonstrate the concentration of alcohol in someone's blood except by chemical analysis. Thus, as a matter of statutory interpretation, it would lead to absurd and unworkable results to interpret the statute to permit evidence of the defendant's blood alcohol content derived from a less reliable, extrapolated analysis, such as the one made here, while prohibiting blood alcohol content evidence derived from a more reliable procedure, i.e., chemical testing of the defendant's blood, breath, or urine . . . . Permitting evidence in this behavioral prosecution case of a blood alcohol content derived from a subjective interpretation of the defendant's performance on standard field sobriety tests, without using any of the approved methods and procedures, does great violence to the intent of the statute. . . . Given the potential unreliability of blood alcohol content evidence that is based on this method, and given that [w]e cannot ignore the heightened credence juries tend to give scientific evidence . . . the risk that this type of evidence might have had an improper impact on the jury and on the result of the trial, without the defendant's being permitted to engage in the scope of unfettered cross-examination to which he was entitled, is too great." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 669–73.

We maintain this view and caution the state against seeking to admit opinion testimony concerning an indi-

vidual's BAC, whether it be hypothetical or otherwise, in behavioral cases under § 14-227a (a) (1). Such evidence implicitly relating to the defendant's BAC in behavioral cases violates the spirit if not the letter of § 14-227a (c). Nevertheless, we conclude that the defendant failed to demonstrate the existence of plain error.

### III

The defendant next claims that the trial court violated his sixth amendment right to confrontation by unduly restricting his cross-examination of Lockwood regarding the effects that additional ingested substances may have on the rate at which alcohol will begin to cause observable effects on an individual's behavior. The state responds that the defendant failed to lay an adequate foundation to permit him to cross-examine Lockwood regarding the effects of additional substances because there was no evidence of what additional substances, if any, he had ingested. We agree with the state.

The following facts are relevant to this claim. At trial, Lockwood was permitted to testify as an expert about the amount of time after the consumption of alcohol that it typically takes for the alcohol to have observable effects on an individual's motor functions and the typical BAC associated with slurred speech. The state asked Lockwood several hypothetical questions comprised of facts mirroring those in the present case. The first hypothetical described a man who had consumed a large volume of alcohol in a very short amount of time. The state asked Lockwood if he had an opinion on the speed at which an individual would exhibit the effects of intoxication after alcohol consumption commenced. Lockwood responded that it would take the individual in the hypothetical scenario thirty to forty minutes to become observably intoxicated. The second hypothetical assumed that an individual had slurred speech, and the state asked whether there is a BAC that is associated with that behavior. Lockwood responded that slurred speech usually suggests a BAC of 0.16 or 0.17. Next, the state asked how many alcoholic beverages (drinks) an individual would have to consume to reach a BAC of 0.16 or higher, assuming that the individual weighed 190 pounds. Lockwood responded that the individual would need to consume eight or nine drinks. The state next posed a hypothetical in which an individual was stumbling and slurring words at approximately 9:05 p.m. The state asked what time the individual likely began drinking to have reached a BAC of 0.16 at 9:05 p.m. Lockwood estimated they likely would have needed to start drinking at about 8:35 p.m. The state's final question was whether it was reasonably probable that an individual who quickly drank eight or nine drinks would exhibit slurred speech within thirteen to fifteen minutes of consuming those drinks. Lockwood responded that it was not reasonably probable for this to occur.

The defendant sought to cross-examine Lockwood on whether additional ingested substances could affect how quickly an individual would become visibly intoxicated from alcohol. The following colloquy took place between Lockwood, defense counsel, the prosecutor, and the court:

"[Defense Counsel]: Okay. What about adding other substances to that alcohol?

"[Lockwood]: Could you be more specific?

"[Defense Counsel]: Like, if [the defendant] said he smoked a spliff while he was drinking, would that enhance the effects?

"[Lockwood]: Pardon me, when you say a spliff, you mean marijuana?

"[Defense Counsel]: Marijuana, yes.

"[Lockwood]: Okay.

"[Defense Counsel]: Would that enhance it?

"[The Prosecutor]: I'm going to object at this point, Your Honor. There's been no evidence what a spliff is before this jury or this court as to what that is.

"The Court: Yeah, there hasn't been any evidence of what a . . .

"[Defense Counsel]: A spliff. He smoked—he smoked something. He said he was smoking something at the—[15]

"The Court: Yeah, but there's no evidence, counsel, that that was any—you know—illegal substance or marijuana. Unless I missed it, I didn't hear that. Do you agree with that or disagree with that?

"[Defense Counsel]: I disagree. I think a spliff in general is a substance and that he could enhance—

"The Court: Well, there was no evidence of what the substance was. My question is . . . I'm not aware that that was ever—a question was ever asked of [the defendant] of—you know . . . what [a spliff] . . . contains. I'm not aware of that. Tell me if I'm wrong.

"[Defense Counsel]: Right, I didn't ask him what it contains.

"The Court: All right, all right. So, I'm not gonna . . . it's not in evidence . . . what is in a spliff.

"[Defense Counsel]: But he did smoke something, so I would like to ask this expert if that could enhance the effects.

"The Court: Well, I mean, it could've been a Camel cigarette, I don't know. It could've been an Ashton cigar, you know. Do you follow me? In other words, there's no evidence that it was an illegal substance, is what I'm trying to say . . . so, I'm not going to allow that—

"[Defense Counsel]: Anything about smoking?

"The Court: Not with this—I mean, if you want to argue this, you could do that in closing argument . . . ." (Footnote added.)

We begin our analysis by setting forth the applicable standard of review and the relevant legal principles for assessing a confrontation clause claim. "The right of an accused to effectively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. The defendant's right to cross-examine a witness, however, is not absolute. . . . Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Clark*, 260 Conn. 813, 826–27, 801 A.2d 718 (2002).

"In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . We have emphasized in numerous decisions, however, that the confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. . . . A defendant may elicit only relevant evidence through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Citation omitted; internal quotation marks omitted.) *State* v. *Crespo*, 303 Conn. 589, 610–11, 35 A.3d 243 (2012).

"The trial court has wide discretion to determine the relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is estab-

lished, the evidence . . . is irrelevant." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 23, 1 A.3d 76 (2010).

"To be admissible, [expert] testimony must comply with the requirements for reliability and relevance established in *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)." *Kairon* v. *Burnham*, 120 Conn. App. 291, 292, 991 A.2d 675, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). "To be helpful, an expert's opinion testimony must aid the fact finder in resolving an issue in the case and have some basis in fact." *Weaver* v. *McKnight*, 313 Conn. 393, 410, 97 A.3d 920 (2014).

In the present case, we conclude that the trial court did not abuse its discretion in determining that the defendant failed to establish a proper foundation to cross-examine Lockwood regarding whether other substances could have affected the rate at which an individual can become visibly intoxicated from alcohol. See, e.g., *State* v. *Davis*, supra, 298 Conn. 24–25 (because defendant's evidentiary foundation was insufficient, preclusion of irrelevant evidence did not violate defendant's right to confrontation). The defendant testified that he smoked a "spliff," but the defendant did not define what a "spliff" was or what substances it contained. Because the defendant did not testify what a "spliff" contained, the defendant could have been referencing marijuana, other psychotropic drugs, a combination of the two, or some other substance. Without this evidentiary foundation, any opinion regarding the effect of those substances in combination with alcohol on the rate of intoxication simply lacks any relevance or "fit" in the case. See *State* v. *Porter*, supra, 241 Conn. 65 ("fit" means the "proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract" (internal quotation marks omitted)). The defendant had the opportunity when he testified to lay the factual foundation as to what substances he ingested, but he failed to do so.

Accordingly, the trial court did not abuse its discretion in determining that Lockwood's testimony lacked relevance to the case. Accordingly, the court's decision to preclude it on that basis did not violate the defendant's sixth amendment right to confrontation.

IV

The defendant's final claim is that the court improperly denied the defendant's motion to suppress certain statements that he made to the police (1) at the scene of the accident and (2) in the intoxilyzer room. In regard to the statements he made at the scene of the accident, the defendant claims that, after he was placed in handcuffs, he was in custody for purposes of *Miranda* and

had not been advised of his *Miranda* rights at that time. As for the statements made in the intoxilyzer room, the defendant claims that, although he had been advised of his *Miranda* rights prior to giving these statements, the court should have suppressed the statements because he never expressly or impliedly waived his *Miranda* rights. The state responds that the defendant's claims are unreviewable because the record is inadequate for review.[16] Alternatively, the state argues that the defendant was not subjected to custodial interrogation at the scene of the accident and that the defendant's conduct in the intoxilyzer room "evinced a knowing and intelligent waiver of his right to remain silent . . . ." We agree that the record is inadequate to review whether the defendant (1) was subjected to custodial interrogation at the scene of the accident and (2) waived his *Miranda* rights in the intoxilyzer room.

The following additional procedural history and facts are relevant to our resolution of this claim. On January 10, 2020, the defendant filed a motion to suppress. The motion to suppress asserted that the defendant, while in custody, made inculpatory statements to law enforcement officers, the statements were made without a valid *Miranda* waiver, the statements were involuntary, and that the statements were tainted by a prior illegality.

On February 4, 2020, the defendant filed an addendum to his motion to suppress, requesting the suppression of certain statements that were made by the defendant after he was handcuffed. The addendum specified which statements the defendant was moving to suppress but did not reference facts in support of his claim. The statements specified in the addendum were limited to (1) "[the] defendant's responses to police asking him if he was driving," (2) "[the] defendant's responses to police asking him where his car was," (3) "[the] defendant's responses to police asking him what "RDW Works" is," and (4) "[the] defendant's answer of '13' to the postarrest questions . . . ."

It is important to note that the record is extremely opaque with respect to the manner in which the motion to suppress was adjudicated. The court did not hold an evidentiary hearing prior to ruling on the motion. No witnesses testified in support of or in opposition to the motion to suppress. The record also does not memorialize an agreement between the parties on the procedure to be followed for litigating the motion to suppress. From our review of the record, it appears that the court and the parties agreed that the court would review the police body camera footage and base its decision solely on what it could determine from these videos.

On February 5, 2020, the court, *B. Fischer J.*, asked the parties to address the defendant's motion to suppress. In support of the motion, defense counsel argued: "I am specifically asking for these statements after he was handcuffed because, at that point, he was in cus-

tody, and these are questions from the police, so this is interrogation. He did not waive his *Miranda* rights, did not sign the form at the station." The prosecutor responded: "[T]he defendant was not in custody at that point. It was a *Terry* stop,[17] and it was based on reasonable and interpretable facts. The defendant had already walked away once, and, based on his behavior, using handcuffs was the least restrictive means in order to keep him on the scene. Therefore, the state would request to have those statements be admissible." (Footnote added.)

Immediately after this exchange, the court stated the following, which comprises its entire decision with respect to the motion to suppress: "I'm going to deny the defendant's motion to suppress . . . and I'll just recite some of our case law on this issue. General, on-the-scene questioning of citizens in the fact-finding process is not affected by *Miranda* holdings. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present. An officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions, but the detainee is not obliged to respond, and, unless the detainee's answers provide the officer with probable cause to arrest him—so forth. . . .

"[A]nd this is the case of *State* v. *Mucha*, [137 Conn. App. 173, 189, 47 A.3d 931, cert. denied, 307 Conn. 912, 53 A.3d 998 (2012)] . . . that the routine investigatory stage of a motor vehicle accident is a noncustodial situation and, thus—that statements made by a defendant to a police officer in such circumstances are admissible regardless of whether the police officer gave the defendant his *Miranda* warning. The court, moreover, has concluded that conducting a field sobriety test does not place a suspect in custody for the purposes of *Miranda*. So, the questions the police asked, *Miranda* warning was not required based on what I observed in the body cam . . . ."

The court made no factual findings beyond its assertion that "the questions the police asked, *Miranda* warning was not required based on what I observed in the body cam . . . ." Although the court's statement suggests that the trial court relied primarily on the body camera footage in deciding to deny the motion to suppress, the record is unclear as to when and how the body camera footage[18] was admitted into evidence and reviewed in relation to the motion to suppress.[19] More importantly, the court did not make any explicit findings regarding the content of the video. The court later signed the transcript of its brief oral ruling.

Practice Book § 61-10 (a) provides: "It is the responsi-

bility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire record is complete, correct and otherwise perfected for presentation on appeal." Practice Book § 64-1 (a) provides in relevant part: "The trial court shall state its decision either orally or in writing . . . in ruling on motions to suppress . . . . The court's decision *shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor. . . .*" (Emphasis added.) Subsection (b) of § 64-1 further provides that, if the trial court fails to comply with these requirements, "the appellant may file with the appellate clerk a notice that the decision has not been filed in compliance with subsection (a)."

Additionally, it is axiomatic that "[t]he proper procedure by which an appellant may ask the trial court to provide the factual and legal basis for a ruling, or to address a matter that it has overlooked in its decision, is to file a motion for articulation. See Practice Book § 66-5.[20] A motion seeking articulation is appropriate in cases in which the trial court has failed to state the basis of a decision . . . [or] to clarify the legal basis of a ruling . . . [and it is the proper procedural vehicle] to ask the trial judge to rule on an overlooked matter." (Footnote added; internal quotation marks omitted.) *State* v. *Bennett*, 101 Conn. App. 76, 81, 920 A.2d 312 (2007).

In the present case, the defendant filed a motion to suppress statements that the defendant made to the police both at the scene of the incident and while in the intoxilyzer room. The trial court's brief oral ruling, however, addressed only the admissibility of the statements made at the scene of the incident. The oral ruling did not set forth the facts the court found established in making the ultimate determination that *Miranda* warnings were not required at the scene of the accident before the officers questioned the defendant. Although the trial court determined that a "*Miranda* warning was not required based on what [was] observed in the body cam," the trial court did not specify whether the defendant was in custody or subject to police interrogation.[21] Furthermore, the court altogether did not address, either factually or legally, the statements made by the defendant in the intoxilyzer room, including whether the defendant had waived his *Miranda* rights.

Despite the court's failure to include in its oral decision a "conclusion as to each claim of law raised by the parties and the factual basis therefor"; Practice Book § 64-1 (a); the defendant did not file a notice of noncompliance with the appellate clerk. In addition, the defendant failed to seek an articulation pursuant to Practice Book § 66-5.

The defendant argues that, if we find the record to be inadequate for review of his claim, we "should remand the matter to the trial court for further articula-

tion." In doing so, the defendant relies on Practice Book § 61-10 (b), which provides: "The failure of any party on appeal to seek articulation pursuant to Section 66-5 shall not be *the sole ground* upon which the court declines to review any issue or claim on appeal. If the court determines that articulation of the trial court decision is appropriate, it *may*, pursuant to Section 60-5, order articulation by the trial court within a specified time period." (Emphasis added.)

We decline the defendant's invitation to order an articulation in this case because his failure to seek an articulation is not the sole ground on which we decline to review this claim. The defendant failed to exercise at least two avenues to meet his obligation to provide an adequate record for appellate review of his claim. Furthermore, we note that this appeal was filed on October 26, 2020, and it has been more than two years since the court issued its oral ruling on the motion to suppress. This lengthy passage of time would undoubtedly frustrate its ability to remedy the legal and factual lacunas relating to its decision on the motion. Additionally, because there was no evidentiary hearing, the court would not have the benefit of any transcripts to review when attempting to comply with an articulation order.

"Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court, either on its own or in response to a proper motion for articulation, any decision made by us respecting [a] claim would be entirely speculative." (Internal quotation marks omitted.) *Shobeiri* v. *Richards*, 104 Conn. App. 293, 296, 933 A.2d 728 (2007). Because the defendant failed to seek a proper memorandum of decision addressing all the legal arguments he raised in his motion to suppress or to file a motion for articulation, the record is inadequate to review the defendant's claim that he was subjected to custodial interrogation at the scene of the accident and that he did not expressly or impliedly waive his *Miranda* rights after they were read to him in the intoxilyzer room.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Stratton testified that the registration to the license plate number Adlam provided "came back to 44 Admiral Street, and it was registered to [R]DW Works" and that the defendant lived at that same address. The record is unclear as to how Stratton obtained the defendant's address in order to make that connection.

[2] The officers testified that they started the field sobriety tests approximately ten minutes after the defendant returned to the scene for the second time.

[3] "Nystagmus is the inability of the eyes to maintain visual fixation on a stimulus when the eyes are turned to the side, often resulting in a lateral jerking of the eyeball. . . . The premise of the horizontal gaze nystagmus test is that as alcohol consumption increases, the closer to the midline of the nose the onset of nystagmus occurs. To administer the test, the officer positions a stimulus approximately twelve to eighteen inches away from and slightly above the subject's eyes. The stimulus, usually a pen or the

officer's finger, is then moved slowly from the midline of the nose to maximum deviation, the farthest lateral point to which the eyes can move to either side. The officer observes the subject's eyes as he tracks the stimulus and looks for six clues, three for each eye, to determine whether the subject passes or fails the test." (Citations omitted.) *State* v. *Commins*, 83 Conn. App. 496, 499, 850 A.2d 1074 (2004), aff'd, 276 Conn. 503, 886 A.2d 824 (2005), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014). The defendant failed the test and also failed to follow instructions to refrain from moving his head.

[4] The walk and turn test requires the subject to take nine heel-to-toe steps in a straight line, pivot, and take nine heel-to-toe steps back while counting aloud. The defendant failed to keep his hands by his side, fell off the line, and had unsteady balance.

[5] The one leg stand test requires the subject to pick a leg and balance on that leg with the raised leg's toes pointing upward; this must be done while keeping their hands to their sides. The defendant was unable to balance and kept stumbling.

[6] According to Troche, "[t]he [i]ntoxilyzer room has a state calibrated [i]ntoxilyzer machine which calibrates the blood alcohol . . . content and, in that room, [officers] conduct the A-44s. [Officers] look up the person's record, check with [the police] center system, [officers] read [detained individuals] their rights, and [officers] would perform either the blood alcohol test with the breath test or . . . do the urine test all within that room." See footnote 8 of this opinion.

[7] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] "The A-44 form is used by the police to report an arrest related to operating a motor vehicle under the influence and the results of any sobriety tests administered or the refusal to submit to such tests." (Internal quotation marks omitted.) *Winsor* v. *Commissioner of Motor Vehicles*, 101 Conn. App. 674, 678 n.4, 922 A.2d 330 (2007).

[9] The defendant claims that, "[d]uring the state's rebuttal case, it elicited evidence from its expert, who testified to the defendant's BAC. . . . Lockwood gave his opinion that he believed the defendant's BAC to be somewhere around 0.16 and 0.17 at the time the police officers started questioning him. . . . This testimony was improper, as it was unscientific, and was a direct violation of . . . § 14-227a (b), which only permits evidence from chemical testing of the defendant's blood alcohol level at the time of the offense if offered by the defendant. . . . The evidence in this case rises to the level of *extreme unreliability*. In consequence, it violated the defendant's due process rights . . . ." (Citations omitted; emphasis added.) The state responds to the defendant's claim by arguing that "[a] reliability objection is specifically tied to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) [cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)] . . . ."

In his reply brief, the defendant attempted to clarify his claim, stating, "[t]his claim is not based upon an objection to the underlying science but, rather, an objection to a statutory violation. The defendant has not asserted that . . . Lockwood's opinion is not scientifically possible. He has asserted it violated . . . § 14-227a, as it injected a blood alcohol content measurement into a behavioral prosecution."

We observe the following regarding the defendant's characterization of his claim on appeal. First, the defendant inaccurately describes Lockwood's testimony. Lockwood testified about the BAC of a hypothetical individual exhibiting certain behaviors and did not opine directly about the BAC of the defendant. Second, the defendant misidentifies subsection (b) of § 14-227a as containing the prohibition on the admissibility of the defendant's BAC in this case. It is subsection (c) of § 14-227a that limits the admission of a defendant's BAC in a behavioral case only to those instances when the defendant consents to its admission. We read the defendant's reliance on § 14-227a (b), which sets forth requirements regarding the manner in which BAC testing must be performed to ensure the reliability of BAC evidence, as another way of asserting his claim that the testimony was scientifically unreliable. Because the defendant expressly disavows any claim concerning the scientific reliability of the evidence, we review only the defendant's claim that the testimony violated § 14-227a (c).

[10] The defendant has not briefed on appeal any claim based on the relevancy of the evidence or the "lack of definite conclusions." Accordingly, we deem these claims abandoned. See, e.g., *State* v. *Nieves*, 65 Conn. App. 212, 215–16 n.4, 782 A.2d 203 (2001).

[11] The relevant colloquy between the prosecutor and Lockwood during

direct examination was as follows:

"Q. Okay. So . . . assume that the following—assume that the following facts are in evidence. Assume that there was a motor vehicle accident at 8:47 p.m. Assume that the defendant is sober at that time, no alcohol in the body. Assume fifteen seconds to get home, get out of the car, go upstairs, sit down in a chair, take a bottle out, and that bottle is—assume that— in evidence—the bottle is approximately twenty-four ounces, it is filled approximately half with rum, and then leaving one inch, it is approximately— assume that it is a mixture of port wine and some other alcohol and then one inch remaining for cranberry juice. Assume that the defendant then sips from a bottle—a pint of vodka and assume this drink is—it's drank quickly, and that the defendant walks four minutes, and at—assume at approximately 9:05, the defendant has slurred words and is stumbling. Do you, based on your opinion, your training and experience, do you have an opinion on the rate of absorption?

"A. Yes.

"Q. And what is that opinion?

"A. So, the drinking scenario described is a large volume of alcohol in a very short amount of time. The absorption is, again, the process by getting a drug into the blood system. So, we have to think about how are we getting the alcohol from the stomach into the small intestine, and, in this scenario, studies have shown that it takes about thirty to forty minutes for an individual to absorb to the peak—peak alcohol concentration of the drinks they've had.

"Q. Okay, and let's assume again, assume that . . . the defendant in these set of facts are—was approximately five feet, ten inches, let's say 190. Does that have an effect on your opinion on the rate of the absorption?

"A. On the rate of my absorption—just on the rate of absorption, no.

"Q. Okay, and do you have an opinion on how much time it would take to absorb the alcohol?

"A. Yes, as I mentioned it—I would estimate between thirty and forty minutes.

"Q. Okay. Does that change—does that opinion change if the person has a full stomach or an empty stomach?

"A. If the person has a full stomach, we have to push back the absorption time; so, it actually would take a little bit more—more time to reach the peak.

"Q. Okay, and now, based on your training and experience, if somebody has—assume that somebody has slurred words. Do you have a BAC that you associate with slurred words based on your training and experience?

"A. Yes.

"Q. Okay, and what is that?

"A. So, slurred speech, when we talk about slurred speech, we're actually talking about the musculature around the mouth being affected, and this means that we have a significant amount of alcohol. When we see slurred speech, we usually think of a BAC around 0.16, 0.17 or higher.

"Q. Okay, and do you have an opinion on how many drinks you would have to drink in order to get to that level of a BAC?

"A. Yes.

"Q. And what is that?

"A. Given the parameters—

"Q. Hm-hmm.

"A. —of the previous question?

"Q. Yes.

"A. Okay. So, for an individual that weighs around 190 pounds, each drink would raise the BAC about 0.02 parts per deciliter or percent. So, if we give—if we take the BAC of 0.16, that would be about eight drinks. As I mentioned to you, this process of metabolism or breaking down is always occurring, so we'll give eight or nine drinks.

"Q. Okay, and let's assume that somebody that—there's somebody stumbling, slurring words, at approximately 9:05. What time would they have to stop drinking in order to show those—have slurred words at 9:05? How long—how long ago prior would they have to start showing those symptoms?

"A. I'm looking—estimating, not given the time of absorption, somewhere around 8:30—I'm sorry 8:35."

[12] The defendant relies on *Rowe* v. *Superior Court*, 289 Conn. 649, 663, 960 A.2d 256 (2008), and *State* v. *Fernando A.*, 294 Conn. 1, 31 n.26, 981 A.2d 427 (2009), to support his argument that his claim is preserved. In those cases, our Supreme Court found that a claim was preserved when the objection raised at trial and those raised on appeal were related, meaning "there [was] substantial overlap between [the] theories under the case law." (Internal quotation marks omitted.) *State* v. *Fernando A.*, supra, 31 n.26. In

the present case, the general relevance and "definite conclusions" objections raise completely different legal grounds than an assertion that the testimony violated a prohibition on admissibility contained in § 14-227a (c). If the defendant had raised § 14-227a (c) during his objection at trial, the trial court would have been alerted to the need to consider the nature and application of the statutory prohibition.

[13] In an attempt to demonstrate that the admission of Lockwood's testimony violated his due process rights, the defendant cites *State* v. *Johnson*, 312 Conn. 687, 94 A.3d 1173 (2014), as authority that his claim is constitutional in nature. The claim in *Johnson* concerned the admission of an out-of-court identification of the defendant that was tainted by unnecessarily suggestive identification procedures. It is well established that the admission of an out-of-court identification that is unreliable and based on unduly suggestive identification procedures violates due process. See, e.g., *Neil* v. *Biggers*, 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). The defendant does not explain how the jurisprudence relating to the admission of an unreliable out-of-court identification is applicable to the present case.

[14] The following exchange occurred between defense counsel and Lockwood during cross-examination:

"[Defense Counsel]: All of those estimates you gave [to the prosecutor] are just estimates, correct?

"[Lockwood]: Yes.

* * *

"[Defense Counsel]: Okay. Also, you don't actually know [the defendant], correct?

"[Lockwood]: I do not.

"[Defense Counsel]: You've never met him and—right?—before this?

"[Lockwood]: I have not.

"[Defense Counsel]: And you've never tested him?

"[Lockwood]: I have not."

[15] The following exchange occurred between defense counsel and the defendant on direct examination:

"[Defense Counsel]: . . . Okay. Mr. Waters, then, after drinking the Jamaican splash, what did you do?

"[The Defendant]: So, after I drunk the Jamaican splash, I had the half-pint of vodka, and then I also had a spliff—half a spliff left on my coffee table; so, I just started smoking that and sipping on—on the half-pint of vodka."

Later, during defense counsel's direct examination of the defendant, the following colloquy occurred:

"[Defense Counsel]: Okay, and you said that you were also smoking a spliff that was on your coffee table?

"[The Defendant]: Yes."

[16] Specifically, the state claims that the record is inadequate to review the defendant's statements at the police station because "[t]he trial court did not make any factual findings or legal conclusions regarding [those statements]," and the defendant failed to seek an articulation from the trial court. The state also argues that the entirety of his suppression claim is inadequately briefed. Although we agree with the state that the record is inadequate to review the defendant's claim, we do not agree that the defendant's claim is inadequately briefed. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" (internal quotation marks omitted)).

[17] See *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[18] The body camera footage consists of approximately three hours of film from Correa's, Stratton's, and Troche's body cameras on the night of the accident. The footage shows the officers' interaction with the defendant both at the scene of the accident and in the intoxilyzer room. Some of the facts in the recordings are undisputed by the parties, such as the fact that the defendant was handcuffed, asked questions by the police, and failed three field sobriety tests. Other facts are disputed by the parties, including the defendant's statements at the scene of the accident relating to whether he believed he was being detained or whether he knew he was not under arrest.

[19] We note that, after issuing its oral decision on the motion to suppress, the court marked the DVDs containing the body camera footage as court exhibits two, three, and four.

[20] Practice Book § 66-5 provides in relevant part: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable.

Any motion filed pursuant to this section shall state with particularity the relief sought and shall be filed with the appellate clerk. . . .”

[21] “Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation.” (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 294, 25 A.3d 648 (2011). The court may have concluded that, even if the defendant was in custody, he had not been subjected to police interrogation and, thus, *Miranda* warnings were not required.

---